## CONTRACT FOR SALE OF PETROLEUM PRODUCTS.

Circuit Court of Wood County.

RUTH M. MILLER v. T. J. VANDERGRIFT AND THE OHIO OIL
CO. ET AL.

Decided, 1892.

*Gas and Oil Lease Construed—Held to Have Been in Effect a Sale of
Petroleum Products—Effect of Temporary Provision for Gas for
Lessor's Use, and of Extension of Time for Opening a Well.*

1. The acceptance and use of gas by a lessor for lighting and heating
   purposes, supplied by a gas company and paid for by lessees, in
   consideration for which the lessees are granted an extension of
   time to open a well producing oil and gas, which, by reason of
   the intermingling of the oil and for want of marketable facilities
   for the oil, was unprofitable to operate for either oil or gas, neither
   extends the terms of the lease nor waives conditions of forfeiture
   for noncompliance therewith, especially after the expiration of the
   term contracted for and in the absence of a well profitably pro-
   ducing either gas or oil; and the lessor is not required to directly
   notify lessees to shut off the gas from the house after giving gen-
   eral notice of the expiration of the lease.

2. A contract to drill and operate oil and gas wells for a royalty or
   fixed compensation for the gas or oil produced, with time limit
   within which wells are to be completed and extentions of the term
   granted in case profitable wells are developed, and upon failure to
   complete wells within stipulated periods subject to rental at a
   stipulated sum per acre or forfeiture of lease of lands for the term,
   is not a lease within the ordinary acceptation of the term but is
   a sale of petrolium products.

SCRIBNER, BENTLEY AND HAYNES, JJ.

PER CURIAM.

This is an action regarding a so-called oil lease, or gas con-
tract. The petition recites that Mrs. Miller is the owner of
certain lands in this county, and July 29, 1886, entered into a
contract with one T. J. Vandergrift regarding the production
and disposition of the oil and gas under the lands.

The general nature of the oil and gas leases, as they are gen-
erally called, has been indicated by this court so many times,

that we will not now repeat our views on that subject. It is sufficient to say that we regard them as not leases in the ordinary acceptation of the term, but as a sale of the oil and gas under certain stipulations and provisions embodied under a contract.

This contract provides in the forepart of it as follows:

"That the said party of the first part for the consideration of the covenants and agreements hereinafter mentioned, has granted, demised and let unto the party of the second part, his heirs or assigns, for the purpose and with the exclusive right of drilling and operating for petroleum and gas, all that certain tract of land. (Here follows a description of lands.) The following clause also gives the party of the second part the right of using sufficient water for their operations upon said land; the right to lay pipes and convey oil and gas, and the right to remove any machinery or fixtures, on said premises for, and during the term of three years from the date hereof and as much longer as oil or gas is found in paying quantities thereon."

The next clause provides for the payment of, and delivery to the party of the first part, a certain share of the oil which shall be found on the premises, which is to be delivered to her free of expense into tanks or pipe lines to the credit of the first party, and should gas be found in sufficient quantities to justify marketing the same, the consideration in full to the party of the first part, shall be $300 per annum for the gas from each well so long as it shall be sold therefrom.

It is further agreed that the party of the second part shall complete a well on the above described premises within six months from the date hereof, and in case of failure to complete such well within such time, the party of the second part agrees to pay to the party of the first part for such delay, a yearly rental of one dollar per acre on the premises herein leased from the expiration of said six months until such well shall be completed; the said yearly rental amounting to $80 shall be deposited to the credit of the party of the first part in the Farmer's National Bank in Findlay, or be paid direct to the first party. And a failure to complete such well or to make such deposit or payment as above mentioned, shall render this lease null and void and to remain without effect between the parties hereto.

The next clause provides for the damages to growing crops or timber, and the next clause is as follows:

"The party of the first part shall locate the first well. After the completion of the first well, no further operation to sink a second well for six months thereafter, shall render this lease null and void."

The petition avers that the Ohio Oil Company claims the title which was originally granted to Vandergrift by a certain assignment, but for certain reasons, the assignment is of no effect and the Ohio Oil Company really has no such right as it claims.

The petition alleges that a well was completed on the premises within one year from the date of the contract—not within six months as provided, but within one year. The petition also states that the term of three years has fully expired, and neither gas nor oil is now being produced or found in paying quantities or in any quantity whatever on said lands, and neither has oil or gas been found or produced in any quantity whatever on said premises by the defendants or either of them, at any time since the completion of said first well. The said first well was completed within one year after the date of said lease, yet neither said lessee nor any of said defendants have commenced operations to sink a second well on said premises and that by reason of this failure the lease and contract have become null and void. The petition further avers that the Ohio Oil Company by its employes has entered upon said premises and placed thereon certain timbers and machinery without any authority or right whatever, and unless enjoined by this court will proceed to possess and occupy said lands to the great and irreparable damage and injury of said plaintiff, "and the plaintiff prays an injunction restraining the defendants and each of them from asserting any further right, title or interest in said lands under said contract, or from molesting or disturbing the plaintiff in the free and uninterrupted use and possession of said lands themselves or by their employes, to erect derricks, plant machinery, lay pipes or drill oil or gas wells, or commencing so to do under said contract, and that on the final hearing of this cause, the

said written contract may be found, held and adjudicated to be of no binding force or efficacy and that the same be declared to be forfeited, annulled, canceled and held for naught and for all proper relief.''

The Ohio Oil Company filed an answer alleging the proper transfer by T. J. Vandergrift to it of his rights under the said contract and alleging that this company drilled a well upon the premises at an expense to them of about $1,500. That at the time this lease was completed and delivered and when the well was being drilled, although it provides for both oil and gas, neither party had any idea that any oil would be produced on these premises; that really as the parties understood, gas and gas alone, was expected, when to the surprise of all parties the well proved to be an oil well. The answer does not allege whether or not the well produced oil in paying quantities, but alleges certain reasons to show that the marketing of the oil was not convenient or practical at the time, that no pipe lines were then within any reasonable distance, and that the parties could not have operated the well with profit to either party; and then follows this averment:

''That thereupon, by mutual agreement of the parties, the lessees undertook for themselves and their assigns to supply, and did supply, gas from the gas line of the North Western Ohio Natural Gas Company to heat the dwelling-house of said plaintiff on said lands; that said lessees and their assigns have ever since so furnished and are still furnishing gas at their own expense to her, in lieu of operating said well and of drilling a second well on said lands within the time prescribed in the lease; and that defendants at an expense to themselves of $116.10, and without expense to plaintiff. piped such gas from the gas line aforesaid to plaintiff's dwelling-house and made the connections with her stoves therein; all of which she received as full compensation for rental and delay in drilling said second well. That until defendants began to furnish gas as aforesaid the cash rental provided for in said lease was fully and promptly paid.''

And then proceeds to make certain allegations to show that the failure to operate this well or to drill other wells, did not result in actual harm to plaintiff as her lands are not drained; that the price of oil has advanced since that time, and the plaintiff has

lost nothing, but on the contrary has been the gainer by the fact of said lands not being operated.

The answer also alleges:

"That at the commencement of this action it was the purpose and intention of defendants to operate said well and drill and operate other wells on said lands, pursuant to and under said lease, and that but for this injunction, additional wells would now be completed and in operation on said lands, and the plaintiff would be receiving her royalty on the production thereof provided for in the said lease."

Now at the time this action was begun, July 14th, 1890, it will be seen that the original three-year term of the lease had long since expired; that if the lease were continued under this contract, it would result from that clause in the lease which was to extend it in case oil or gas is produced or found in paying quantities thereon. Evidence was introduced by the defendant in support of these allegations of its answer. Quite an amount of evidence was introduced to indicate that, considering the way the parties were situated, the oil which this well would produce could not be marketed so as to make it a paying thing either to the company or to the plaintiff, and while the well did produce oil and some gas, the amount was not more than about five to one hundred and fifty barrels per day, and that the gas was so intermingled with the oil, that as a gas well it would amount to nothing, and that the pipe lines were so distant, that to market this oil would not pay in the quantities produced by the well. It was conceded by the plaintiff that in a general way, where there were the usual facilities, a well producing this amount of oil would be regarded as producing in paying quantities. It is conceded by all that no second well was drilled or begun. When this well came in, it was shut off and remained in that condition, and in fact is in that condition now.

The main reliance of the defendant to sustain its position and its rights to continue operations upon this land seems to arise upon this alleged contract that was made regarding the use of gas, and its true interpretation. The evidence shows this to have been the arrangement: this well having been completed in April

or May, 1887, in the fall of that year, the plaintiff getting no advantage from the well or the defendant either, and being anxious to get gas to use in her house, made application, once by letter and once after verbally, to the representative of the company regarding the supplying her with gas, and told them that if they would procure gas from the gas company's line that ran through the neighborhood, and furnish her with gas for the house, she would not hurry them in opening up that well. The testimony upon the making of this arrangement is not specially conflicting. Arrangements were made with the gas line company whereby that line was attached, at the expense of something over $100, pipes laid to the plaintiff's house, and the gas turned on, and she began using it. No bills for the use of that gas were sent by any person to her and she paid nothing. She continued to use it, and the defendant continued to pay the bills which were rendered to it by the gas company for the gas, amounting to something over $100 a year.

It is proof, however, that some time prior to the beginning of this action, she caused the defendant company to be notified that she regarded the lease as terminated and that they should proceed to take their "stuff" off the premises. There is a conflict in the testimony as to when this notice was given. It was given, it seems to a Mr. Donnell, a representative of the defendant company. He admits it was given, but the conflict is as to the time. He says in his testimony it was only about sixty days before the beginning of this action; on the other hand, the plaintiff testifies that she instructed her son, a young man about twenty-eight years of age, to give this notice of her claim that the lease was forfeited more than a year before the bginning of this action, and her attention being called to some circumstances upon the day of these instructions to her son and her son's testimony as to the time, she gets at it in two or three different ways all of which point to this item, so far as her testimony goes. The young man to whom the instructions were given died before the trial of the case in this court, and after the trial in the common pleas court, and his evidence was read before us. In that testimony he says he received these instructions from his mother a year before this suit was begun and that he notified Mr.

Donnell a year before this action was begun; he repeated that statement several times in his examination in chief. His cross-examination is quite brief, but after making this statement it contains this, "The talk I had with Donnell was a little over a year before they went on with their machinery; it was three years and six months after the date of the lease." This last statement would seem to apply to that notification, would seem to make the notification somewhat less than a year before the beginning of the action—six months perhaps—but from the testimony we have to balance these probabilities, we think that this notice was given about six months before the beginning of this action, and the question remains, what was the consequence of this notice under these circumstances?

It is to be remarked that the plaintiff never gave the defendant any direct notice to shut off this gas, or that she would no longer receive the gas; neither did she turn the gas off herself, but simply gave this general notice that she regarded the lease as having expired, and the defendants were ordered to take their property off the premises. The defendant argues that as long as she continued to use this gas and did not turn it off, and did not notify them to turn it off, that she must be held notwithstanding her general notice, as receiving the fruits of this contract, and extension of the time provided for in the verbal contract must be held as continuing as long as she is using the gas. Well while the testimony does not indicate that she gave any direct notice to the defendant to shut off this gas, yet her general notice has, we think, covered this and was sufficient for that purpose. When she notified them that the lease—the whole contract under which they were operating—she considered as at an end, and that they were required to take their property off her premises, and did all those things, we think it was sufficient notice to them to terminate everything under the contract.

Now there is no proof that she had any arrangement herself with this gas company. She did not make the contract with the gas company to have her house supplied with gas from it. She did not order it turned on. The whole arrangement was brought through the defendant's agents. It would not be ex-

pected that she would go to this gas company itself; but it would be expected that she would apply to the defendant, its agent. There is no proof that she, herself, could have turned this gas off. We know something of the general nature of this gas, and it does not appear, from the testimony at least, that she had any facilities herself for turning it off, or that she could have done so, and it would seem fairly to be implied, that as long as it was delivered at her house to her stoves, she could not very well make other arrangements for heat in place of the use of the gas, and that as long as the defendant, with notice, allowed that gas to be run into the house, she did not alter her position to them by using it; that unless they had made some contract by which she was held bound to use this gas, this general notice of hers was sufficient to terminate that arrangement.

It is conceded by the defendant that this arrangement regarding the use of the gas was in lieu of the rental and the further operations under the lease and drilling of another well, etc. The testimony does not indicate that this was a fair interpretation of this arrangement. If it was made in lieu of rental, it would not be expected that the defendant would afterwards pay rental in money, and yet it is substantially uncontradicted that this arrangement was made in the fall, and that following that, a month or so, a rental of $80 was paid by the defendant which would extend the matter a year, perhaps from January, 1888, to 1889. The first rental seems to have been paid according to the testimony, late in the fall of 1886, or probably January, 1887, and the next rental in January, 1888. Now we regard this arrangement as to furnishing gas as a sort of temporary make-shift between the parties to extend the time for the opening up of the well and the further proceedings under the lease. That it was not in its nature terminated, or not to be extended over a long period of time; that it was such an arrangement that might be terminated by the parties at the end of any reasonable time. The contract in this case was for gas and oil, and it was understood that gas alone was expected. In case gas had been found, then plaintiff would have received $300 per year for each gas well drilled on the land. She had provided

for two wells and she was getting no gas, and was getting no revenue at all except the furnishing of gas to her house in this way.

Now we think, to hold that, after she saw fit to terminate the verbal arrangement by notice, these parties might omit to open up that well or to drill another, would be doing violence to the fair interpretation of that contract, and would result in unfairness to her considering the contract she had made. We think that when this notice came to these parties, it was incumbent upon them to proceed, at least within a reasonable time, to go on with this work—to finish the well and to drill the other well. We think they wholly failed and omitted to do that for an unreasonable length of time, and that the plaintiff availed herself of the right which she had to comence this action to terminate the whole arrangement.

In that view of the case of course the plaintiff's petition must be sustained, and the injunction which is prayed for by her granted, and that will be the decree of this court; and costs will be awarded against the defendant as usually follows in such cases.